## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

WILLIAM TEETS,                                              CASE NO.   8:17-cv-00641-SDM-CPT

       Plaintiff,

**v.**

SHERIFF GRADY JUDD, in his official capacity as
Sheriff of Polk County Sheriff's Office; CORIZON,
INC., a/k/a, CORIZON HEALTH, LLC, f/k/a, and
CORRECTIONAL MEDICAL SERVICES, INC.
("CMS") were the contracted medical providers for
the Polk Central County Jail; JEFF HENRY; JERRICE
WAGNER,

       Defendants.

_____/

## FOURTH AMENDED COMPLAINT

Plaintiff, WILLIAM TEETS, hereby sues Defendants GRADY JUDD, in his official

capacity as Sheriff of Polk County; CORIZON INC. ("CORIZON") a/k/a CORIZON HEALTH,

LLC.[1], a Tennessee corporation ("CORIZON"); JEFF HENRY; and JERRICE WAGNER and

alleges:

## INTRODUCTION

1.   This is a civil rights action on behalf of Plaintiff, WILLIAM TEETS, whose rights

under the Eight and Fourteenth Amendment to the United States Constitution were violated

when those who were charged with monitoring and providing medical treatment to Plaintiff,

_____

[1] Also formerly known as: Corizon Health, Inc.; and or Correctional Medical Services, Inc.
("CMS") and Prison Health Care ("PHS")

WILLIAM TEETS, were deliberately indifferent to his medical condition, which led to him suffering severe and permanent injuries.

2.   This action for monetary damages is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Eight and Fourteenth Amendments to the United States Constitution, against Defendants, SHERIFF GRADY JUDD, and CORIZON, for failing to monitor and provide the appropriate medical treatment to Plaintiff, WILLIAM TEETS, which led to permanent and severe injuries.

## JURISDICTION AND VENUE

3.   This action arises under the constitution and laws of the United States, particularly 42 U.S.C. §§ 1983 and 1988, and the Eights and Fourteenth Amendments to the United States Constitution as well claims under the common law of Florida, arising out of Plaintiff's mistreatment while incarcerated in the Polk County Jail ("PCJ") in Polk County, Florida.

4.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

5.   Venue is proper in this district because it is where the events complained of occurred.

6.   There is no administrative exhaustion requirement regarding Plaintiff's civil rights claims under 42 U.S.C. § 1983.

## PARTIES

7.    Plaintiff, WILLIAM TEETS, resides in Lakeland, Polk County, Florida 33805. At all pertinent times, and specifically from on or about June 26, 2012 through on or about January 17, 2017, Plaintiff was incarcerated at Polk County Jail ("PCJ"), located Polk County, Florida.

8.   Defendant, SHERIFF GRADY JUDD, is the elected Sheriff of the Polk County

Sheriff's Office. Defendant, SHERIFF GRADY JUDD, is in charge of the day-to-day operations of the Polk County Sheriff's Office and is responsible for setting policy for the Office. His duties include properly screening potential employees and entities prior to hiring and retaining them, properly training and supervising those employees and entities, and taking corrective actions to prevent the harm to inmates and pre-trial detainees when specific instances of habit, routine practices, and customs of Constitutional violations are apparent. Defendant, SHERIFF GRADY JUDD, is ultimately responsible for the protection and safety of the individuals who are in his custody. Defendant, SHERIFF GRADY JUDD, is being sued in his official capacity as Sheriff of the Polk County Sheriff's Office.

9.   Defendant JEFF HENRY, was at times material herein an employee/deputy with the Polk County Sheriff's Office and was acting within the scope of his authority and under the color of state law.

10. Defendant JERRICE WAGNER, was at times material herein an employee/deputy with the Polk County Sheriff's Office and was acting within the scope of his authority and under the color of state law.

<u>History of Inmate Medical Health Service Agreements with Polk County Sheriffs and Notice to the Defendant Sheriff Grady Judd of Defendant Corizon, Inc. Deliberate Indifference</u>

11.   During March 1990, Prison Health Services, Inc. ("PHS"), entered into a contract with Lawrence W. Crow, Jr., in his capacity as the Sheriff of Polk County, Florida, to provide medical services to inmates of the Polk County correctional system.  At the time of this contract the Defendant Sheriff Grady Judd was a high ranking official under Sheriff Crow.  In April 1994, Michael Cullaton, an inmate of the Polk County Jail Annex, suffered a head injury and was taken to the PHS infirmary at the PCJ.  A hematoma developed in Cullaton's brain, which required his immediate hospitalization. The PHS employees at the infirmary failed to recognize the

3

seriousness of Cullaton's situation, however, and thus did not have him transported to the hospital. As a result of their negligence, Cullaton went into a coma; thereafter into a vegetative state. Cullaton's guardian thereafter made a claim against the Sheriff for Cullaton's injuries.  The Sheriff's contract with PHS contains an indemnity agreement that reads, in pertinent part, as follows:

> PHS assumes the entire responsibility for performance of all work and services and duties described in this Agreement. For specific valuable consideration and other benefits . . . PHS further expressly agrees to indemnify SHERIFF . . . and Polk County, Florida, and agrees to hold them . . . . harmless from any and all claims or actions for personal injury, death or property damage and from any other losses, and all damages . . . or expenses, including reasonable attorney's fees, which arise out of, in connection with or by reason of, the performance of all services, duties and responsibilities described pursuant to this Agreement . . . .[2]

12.   The Defendant, Sheriff Grady Judd, became Sheriff of Polk County in 2004.  At all times material herein Defendant Sheriff Judd was responsible to provide for delivery of reasonably necessary medical, dental, mental health and substance abuse care to individuals under his custody and control and incarcerated at the PCJ.

13. On February 3, 2006, Polk County Sheriff's Office through Defendant Sheriff Judd acting in his official capacity as Sheriff and responsible to provide for delivery of reasonably necessary medical, dental, mental health and substance abuse care to individuals under the custody and control in Polk County Jail entered into an Inmate Health Care Services Agreement/Contract with CMS,[3] in which CMS contracted to provide for delivery of reasonably necessary medical, dental, mental health and substance abuse care to individuals under the

---

[2] *Florida Polk County v. Prison Health Servs., Inc.*, 170 F.3d 1081 (11th Cir. 1999).
[3] CMS utilizing essentially the same contract, the same principles and albeit changed its name to Corizon Inc. and then later to Corizon LLC a/k/a Corizon Health LLC upon information and belief in fraudulent attempt to avoid responsibility for widespread litigation throughout the United States over claims of widespread medical abuse, including the state of Florida and Polk County, Florida.

custody and control of the Defendant, SHERIFF GRADY JUDD, and incarcerated at the PCJ.
**(see CMS contract Exhibit A).**

14.   On or about June 3, 2011, PHS and CMS, foreign corporations both located in the state of Missouri upon information and belief changed their legal names to CORIZON, INC. These changes came about during the wake of litigation throughout the United States over claims of widespread medical abuse, including the state of Florida and Polk County, Florida.  These claims clearly placed the Defendant Sheriff Judd on notice of the need to correct the alleged widespread medical abuse.  Upon information and belief Defendant Sheriff Judd turned a blind eye to now the Defendant CORIZON's continued widespread medical abuse occurring at throughout his tenure as Sheriff in charge over the PCJ.

15. The Defendant Sheriff Judd knew or should have known, Corizon's medical and mental health providers nationwide routinely failed to conduct adequate rounds or clinical examinations of their patients, routinely failed to accurately maintain or review patients' charts, and routinely denied patients access to needed doctors and medication, all of which placed the health and lives of Corizon's patients at risk. These are the very policies, practices and customs that caused injury to the Plaintiff WILLIAM TEETS.

16.   The aforementioned customary and known practices resulted from cost-cutting Measures adopted by Corizon to maximize profits by, among other things, inadequately staffing facilities, employing unqualified staff, failing to train or vet staff, and delaying and denying life-saving care even in emergency situations.

17.   Corizon is a for-profit, billion-dollar company that was formed in 2011 when its predecessor, Correctional Medical Services, Inc. ("CMS"), merged with PHS Correctional Healthcare

("PHS"). **See Exhibits "B-C-and D"** Under each of these names, Corizon has had a long and well publicized history of sacrificing the health and lives of inmates for profit. Corizon, which operates in hundreds of correctional facilities in dozens of states, uses the same profit-maximizing approach nationwide: "[T]heir whole goal," one Arizona judge has observed, "is how not to do any work.[4]

18. The Eleventh Circuit affirmed a jury finding that Corizon pursues a policy of denying medical treatment to inmates, and even refusing to send prisoners on the brink of death to hospitals, in order to save money. In *Fields v. Corizon Health, Inc.,* 490 F. App'x 174 (11th Cir. 2012), the jury confirmed that this policy had caused the gruesome suffering and permanent paralysis of Brett Fields. Mr. Fields as the Plaintiff in the instant matter had complained of a severe bacterial infection for several weeks, but a PHS nurse refused to send him to the hospital and instead gave him Tylenol even as his legs began to twitch, he lost his ability to walk, and his intestines descended out of his rectum. The Eleventh Circuit affirmed the jury's finding that Mr. Fields's anguish resulted from PHS's policy of "delay[ing] treatment to save money," which it "implemented ... with deliberate indifference as to the policy's known or obvious consequences" for the company's patients. ld. at 184-85 (internal quotation marks and alterations omitted).[5]

19.   In Florida, a 2015 investigation into Corizon' s medical care at the Florida Women's Reception Center in Ocala found that a woman with diabetes had gone almost three months without insulin, inmates at risk of self-harm were denied psychiatric care while being held in isolation far longer than regulations allowed, and mentally ill inmates were inexplicably taken off their prescribed psychiatric medications.

---

[4] Arizona prisons in health-care quandary, Bob Ortega- Feb. 16, 2012 11:05 PM, The Republic, available at: azcentral.comhttp://archive.azcentral.com/arizonarepublic/news/articles/20 12021 Arizonan-prisons-health-carequandary .html.

[5] A 2014 investigation by the Palm Beach Post revealed that Mr. Frazier was only one of numerous Florida prisoners-Donna Pickelsimer, Anthony Carvajal, and Tammie White among them-whose end-stage cancer symptoms were disregarded by Corizon employees and treated with Tylenol and ibuprofen

20.   By January 20 I 3, approximately 100 days after Florida turned over health care for the vast majority of its inmates to Corizon, the monthly inmate death count shot to a ten-year high, while the number of critically ill prisoners sent for hospital treatment plummeted. These were far from the only victims of Corizon's inhumane penny-pinching practices.[6]

21.   On February 6, 2014, remaining under high scrutiny upon information and belief CORIZON, INC., entered dissolution or Withdrawal from the state of Florida for inter alia, its flagrant ongoing widespread medical abuse, including the state of Florida and Polk County, Florida.

22.   The very same day February 6, 2014, the very same parties open yet under a new name, CORIZON, LLC, listing as its sole member CORIZON HEALTH, LLC, despite these planned orchestrated attempts to avoid the spotlight, nothing has changed in the manner in which CORIZON continued to operate its widespread medical abuse, including the state of Florida and Polk County, Florida and nothing changed in the manner the Defendant Sheriff Judd allowed this foreign corporation to reach into the pockets of the citizens of Florida including Polk County, taking millions of dollars while failing to deliver the most basic necessities to those inmates who suffered serious injuries and deaths, including the plaintiff, WILLIAM TEETS.

23.   At all times material herein the Defendant, CORIZON was an integrated, full-service provider, offering medical care to inmates and pre-trial detainees at the Polk Central County Jail. CORIZON failed to provide physicians, nurses and other healthcare professionals who were responsible for the health and well-being of the inmates and pre-trial detainees at the PCJ, including the Plaintiff, WILLIAM TEETS.

---

[6] Audits and reviews of Corizon in other states reflect the same custom and policy of providing substandard care to cut costs. A February 20I2 report of Corizon's performance in Idaho concluded that the company was deliberately indifferent to the medical needs of prisoners.

24.  At all material times, Defendant, CORIZON employed incompetent nurses, medical staff and doctors and failed to properly staff PCJ or have in place a competent medical director at the Polk County Jail. Defendant, CORIZON, was responsible for delivery of reasonably necessary medical care to the Plaintiff, WILLIAM TEETS, as well as all other inmates of the Polk Central County Jail.

25.  Each and all of the acts of the Defendants and other members of the Polk County Sheriff's Office involved in this incident were performed under the color and pretense of the constitutions, statutes, ordinances, regulations, customs and usages of the United States of America, the State of Florida, and the County of Polk, under the color of law and by virtue of their authority as law enforcement officers and contracted employees for the County of Polk. At all times Defendants were engaged in conduct that was the proximate cause of the violations of Plaintiff's federally protected rights as more particularized herein.

26.  The incident which gives rise to this cause of action occurred within this jurisdiction and within the applicable statute of limitations and this Honorable Court has jurisdiction.

## **STATEMENT OF FACTS**

*Facts pertinent to Plaintiff's fall and knee injury*

27.  On or about December 23, 2013, while housed on an upper-tier floor of the PCJ, along with other upper-tier residents Plaintiff was released for a meal. The pertinent protocol for upper-tier residents was to walk down one staircase, obtain a food tray and cup of water, and return upstairs via a second staircase at the opposite end of the facility. As Plaintiff was approaching the second staircase with his tray and cup an altercation took place between or among detainees just in front and above Plaintiff, which altercation resulted in a number of trays and water cups being dropped, and dropped food and liquid fully covering three stairs.

28.  Because the food and liquid covering three stairs made ascending via that staircase treacherous, Plaintiff and several other inmates reversed course, and began walking in a loop back toward the first staircase, with the obvious purpose of accessing their residence floor without walking up the now unsafe second staircase. Upon observing the altercation, spillage, dangerous condition, and Plaintiff and others backtracking, having been given no other means at the time proceed in the usual direction, and walk up the second staircase.

29.  Defendant Sheriff Judd procedures that the inmates proceed as customary were not to be ignored.  Faced with no option the Plaintiff with torn "slides"—footwear—provided by the Defendant Sheriff was forced to proceed up the staircase despite the staircase being hazardous.

30.  Following the Sheriff's procedure, the inmate just ahead of Plaintiff slipped on the third highest—of the three stairs covered by food and liquid and fell back into Plaintiff causing the Plaintiff to fall badly twisting his left knee, and then landed hard on the concrete floor.

31.  Almost immediately, Plaintiff's left knee began to swell, and rather quickly it reached more than double its original size.

32.  That same day, Plaintiff sought medical treatment for his injured knee. He was seen by Anna Gordon, functioning as a triage nurse, and thereafter told after cursory examination, that he had only suffered a sprain, was prescribed a few days' worth of ibuprofen, and was directed to exercise, specifically to walk and to stretch. Notwithstanding the swelling, Plaintiff's report of extreme pain, and his obvious difficulty walking.  TEETS had an immediate need for treatment which was obvious.  Despite this needed medical care CORIZON's giving him merely ibuprofen was so cursory as to amount to no care at all and done in a conscience and willful and shocking deliberate indifference which ultimately led to his permanent injury as set out herein.

33. Despite the serious nature of the Plaintiff's injuries, CORIZON instructed the Plaintiff to walk and stretch, further aggravating his unattended injuries. Plaintiff begged that the taking of the prescribed ibuprofen, did nothing to help with his pain and swelling intensified over the following days. Upon his reporting of those developments to the Defendant CORIZION the Plaintiff was informed by Defendant CORIZON "there's nothing wrong with your knee"; that "it's just a bad sprain"; that "there's nothing more you can do until you get out [of jail]"; that "it's not life threatening, so we don't have to treat it"; and that he should "use a wet or damp cloth for the swelling."

34. Finally, after the condition worsened over a period of weeks, such worsening specifically including even greater swelling and pain and a resulting difficulty in walking, in response to Plaintiff's frequent complaints an x-ray was finally administered. Following the x-ray, CORIZON nurse, Anna Gordon told Plaintiff that the x-ray was negative for broken bones. Anna Gordon added that "nothing is wrong with your knee"; that "it's not life threatening so we don't treat it"; that "if you think something is wrong, you'll have to fix it when you get out [of jail]"; and that "if you didn't do anything wrong you wouldn't be in this position; I'll just give you a Tylenol but that's it."

35. Despite the obviously worsening condition of Plaintiff's knee for the balance of his incarceration at PCJ, and despite his constant complaints of pain, he was never given an MRI, and never referred to an orthopedist.

36. In or around late 2015 or early 2016, Plaintiff having complained to Defendant SHERIFF's and to Defendant CORIZON's grievance administrators for three years of severe knee pain, an inability to exercise, and an inability to stand for more than the briefest periods or to walk without a severe limp, and given his visually obvious loss of muscle mass and tissue

sagging about the left knee, Plaintiff was examined by Defendant CORIZON.  In that

examination, Plaintiff informed CORIZON that "my knee constantly feels like it's on fire"; that

when "standing for more than an hour at a time [as required for court appearances] my knee

swells to twice its 'at rest' swelling and my knee screams in pain"; that "my knee feels like it's

going to buckle or snap at any time"; and "look at my knee and leg, look at the atrophy in my

leg, something is clearly wrong." CORIZON repeated what was becoming Defendants' mantra,

"CORIZON doesn't treat these things because they're not life threatening," and "since it doesn't

appear that your leg is broken, CORIZON's policy you simply must exercise." CORIZON did

not refer Plaintiff for care.

37.  In or around early 2016, Plaintiff underwent a second knee x-ray. While Defendant

CORIZON observed significant muscle atrophy, and Defendant CORIZON acknowledged

observing on the x-rays the development of arthritis, Defendant CORIZON nonetheless advised

Plaintiff that "there's nothing wrong with your knee," and "there's nothing more [that] we are

going to do."

38.  On or about April 28, 2016, Plaintiff requested CORIZON see the condition of his

knee. That request was summarily denied by Anna Gordon, who told Plaintiff, "complain all you

want, [but] nothing is going to happen"; further told Plaintiff that "the CORIZON doctor has

denied your request to see him and has refused to extend your ibuprofen"; in response to

Plaintiff's request for additional medication told Plaintiff that "you ask too much"; and also told

Plaintiff that "we are not doing anything more for you; if you don' like it, then sue us like

everyone else!"

39.  In summary, not including his verbal requests at the nurses' station and the like,

Plaintiff filed written medical requests on or about, and not limited to, the following dates: December 28, 2013, January 21, 2014, February 24, 2014, May 28, 2014, February 2, 2015, December 18, 2015, December 25, 2015, April 15, 2016, April 27, 2016, and January 8, 2017. Additionally, family members of Plaintiff contacted Defendant SHERIFF and Defendant CORIZON about his medical condition, both by telephone and in writing, on multiple occasions.

40.  On information and belief, Defendant CORIZON was responsible for all decisions to test, not to test, to treat, and not to treat Plaintiff's medical condition.

41.  Since Plaintiff's release in January 2017, he has been diagnosed with a stretched and damaged left patella, a damaged left anterior cruciate ligament, and a damaged left meniscus.

42.  Just recently, Plaintiff has had a first arthroscopic "clean up surgery," also removing scar tissue from his torn meniscus. Following that surgery, Plaintiff was told that his knee is "bone on bone," and that he will require knee replacement surgery in the future.

43.  Plaintiff would use any funds obtained in a judgment in this action to fund knee replacement and likely additional surgeries.

### Facts pertinent to Plaintiff's toe injury

44.  In or around late August of 2012, just two months following the beginning of his detention at SCJ, Plaintiff contracted fingernail and toenail infections from using unsanitary clippers.

45.  After submitting a health services form, being summoned to sick call, and being triaged by Anna Gordon,  Plaintiff was informed by Anna Gordon, "there's nothing we can do," and "you'll have to wait until you're out, [because] we don't treat these kinds of things."

46.  The untreated fingernail and toenail infections spread to Plaintiff's face, scalp, hands, and legs.

47.     Again, after approximately three years of Plaintiff's complaints about the infections, in late 2015 or early 2016, Defendant CORIZON, determined to consider treating Plaintiff with antibiotics for these infections. While an initial blood test administered for the purpose of predicting side effects from such antibiotics was passed—i.e., did not project forthcoming side effects—inexplicably, Defendant CORIZON nonetheless refused to prescribe and issue such antibiotics.

48. By the time of Plaintiff's release in 2017, the spread of infection was so severe that he could no longer be treated by an internist but required—and still requires—a course of treatment from a dermatologist.

***Facts pertinent to Plaintiff's dental condition***

49. Having been detained for over four and a half years during his first year of detention—late 2012 or early 2013—Plaintiff developed a toothache causing him severe pain.

50.  Following his submission of a health care request form, Plaintiff was eventually examined by CORIZON.  After the examination, CORIZON told Plaintiff that "it is a shame you are giving up on your tooth, as it is an otherwise healthy tooth that only requires a root canal."

51.     However, because Plaintiff was indigent and Defendants SHERIFF and CORIZON would not pay for a root canal procedure, Plaintiff was forced to acquiesce in having the tooth pulled.

52.     Even in that context, the scheduled date for the pulling of Plaintiff's tooth elapsed, requiring Plaintiff to submit a second request.

53.     Significant time elapsed without Plaintiff being rescheduled for his tooth to be pulled, during which time he developed an abscess and infection, as a result of which his face, throat and larynx swelled up, such swelling so severe as to restrict his breathing.

13

54. After such elapse of time, on a day when the discomfort was it its peak, Plaintiff attempted a verbal request/plea to Defendant CORIZON. In response to Plaintiff's plea and claim of a "medical emergency," and in the face of a dental condition visible even without Plaintiff opening his mouth, Defendant CORIZON refused his plea for assistance, handed him a sick call form, and instructed that he "fill this out and turn it in like everyone else—besides, it is Friday and everyone [medical personnel] is getting ready to leave."

55. Plaintiff then requested to see a supervisor, and upon observing Plaintiff Defendant SHERIFF's sergeant Lee declared a medical emergency, and escorted Plaintiff to see CORIZON himself. CORIZON prescribed large doses of amoxicillin and ibuprofen, and said, "this is as severe an abscess as I've seen, you should really go to the hospital, but we're going to see if we can save CORIZON a few dollars and treat you right here; you know they don't like to pay for these things."

56. However, due to the severity of the infection, CORIZON was unable to remove the abscessed tooth for several weeks, leaving Plaintiff in excruciating pain during that period.

57. Plaintiff's multiple grievances on the refusal to administer dental treatment and his resulting pain went unanswered, and he personally observed employees both of Defendant SHERIFF and of Defendant CORIZON toss his complaints directly into the trash.

58. The failure to provide timely dental treatment caused Plaintiff both excruciating pain and permanent injury.

***Facts pertinent to access to courts claim***

59. Throughout Plaintiff's period of detainment at PCJ, as a result of his physical and medical mistreatment set forth above Plaintiff believed that he had certain rights under the law to seek relief of various kinds through the judicial system, and in support of those rights submitted

numerous requests to Defendant SHERIFF for access to legal materials, including requests submitted to Defendants HENRY and WAGNER.

60. In response to such requests, and specifically to those directed to him, Defendant WAGNER uniformly responded that the requested materials "are not available"; that such materials could not be provided because "there are no indexes or tables of contents"; and that he could not access such materials because "I don't have any materials lists." Such responses were directed to Plaintiff both orally and in writing. Those responses were misstatements and/or incomplete statements, and as such were made for the specific purpose of denying Plaintiff access to legal materials.

61. Specifically, those and similar responses were set forth in Defendant WAGNER's December 27, 2016 and January 3, 2017 responses to Plaintiff's material request forms.

62. Plaintiff submitted grievances on the inadequacy of SCJ's law library to Defendant SHERIFF's Captain Laurel and to Defendant HENRY. While these grievances did not result in correction, Plaintiff learned from responses thereto that Defendant WAGNER had it within his discretion to furnish him with the requested legal materials and attributed his decision not to do so to Defendant SHERIFF's "exact cite system" policy. Pursuant to that policy, Defendant WAGNER did not have to provide legal materials in the absence of an exact citation therefor. Such "policy," if determined to exist, is nothing more than a sham or cover-up of Defendant SHERIFF's purposeful actions directed toward denying inmates access to legal materials.

63. The denial of such legal materials resulted in Plaintiff's inability to bring legal actions, and specifically in his inability to bring timely legal actions.

***Facts pertinent to policy and custom***

64.  There is a history of widespread medical abuse at the Polk County Jails that put Defendants, SHERIFF GRADY JUDD and CORIZON, on notice of the need to

15

correct the alleged deprivation, and they failed to do so. The following are demonstrative or suggestive of constitutionally deficient care and these as well as other instances served as notice of the deficient care.

    a.    Dominique Middlebrook – November 2007 - Broken foot following a slip and fall because of a leaking air unit in South County Jail. Did not receive medical attention.

    b.    Kenneth Freeman – November 2007 - Slipped and fall on wet floor in South County Jail. X-rays and doctor stated inmate may have a broken tibia. While at Central County, inmate had not seen a doctor in three weeks following the incident.

    c.    Richard Oehlher – December 2007 – In medical dorm on head watch, but not issued a bottom floor, bottom bunk. Had a seizure causing inmate to fall off the top bunk, requiring ten stitches. Not given medications for several days.

    d.    Dwayne L. Joiner – June 2007 – Came in from the hospital with a fractured ankle and three fractured metatarsals. Inmate was not notified of fractures or given any pain medication for seven days. The ankle was never placed in a cast. Ankle healed out of place causing permanent injury.

    e.    Michael Edwards – October 2007 – Had glaucoma, complained that his eyes became infected. Was given drops but requests made to see a specialist were refused.

    f.    Harvey Duncan – October 2007 – Came into jail with a hard cast on his right hand. Was placed in medical dorm, but after three months the inmate still had the cast and was not receiving medical attention. After one-hundred days, the inmate was forced to cut the cast off himself.

    g.    Brian Dodson – January 2008 – Arrived at the jail with a broken jaw. It took three weeks to get jaw wired closed. Wire was to be removed on January 15, 2008, but by January 26, 2008, the wire was still not removed. Subsequently, the inmate removed the wire himself.

    h.    Joseph Hamilton – 2007 – Was placed on a high dosage of Coumadin and failed to monitor inmate's condition. Caused his blood to become so thin, it caused excessive bruising and internal bleeding.

65.  There is a history of widespread medical abuse among jails and prisons which contract with Defendant, CORIZON, and its predecessors ["same companies different name"] to provide medical treatment as those institutions. These instances, which occurred prior to the contract between the Sheriff and CMS put Defendant, SHERIFF GRADY JUDD, on notice of the insufficient medical care that is provided by CMS which just changed its name.  The

16

following are demonstrative or suggestive of constitutionally deficient care and these as well as

other instances served as notice of the deficient care.

a.    Presley v. Epps, et. al., filed June 22, 2005, Jeffery Presley, 24, contracted a serious "staph" infection while in Parchman prison in Mississippi. A CMS doctors initially misdiagnosed his condition as a spider bite. Over several days, Presley's condition grew worse and he pleaded for additional medical treatment. His infected joint became grotesquely swollen and leaked blood. Ultimately, the doctor removed a section of Presley's infected leg and prescribed Tylenol to dull his pain.[7]

b.    A disturbed, deaf-mute prisoner was left for months in his cell on the special needs psychiatric tier, without a mental health evaluation or any attempt to communicate with him. His cell became filthy and he was allowed to remain unwashed for weeks. Correctional staff threw things at him to get his attention, and when he threw things back, he was cited for rule violations.[8]

c.    The Mississippi State Board of Medical Licensure had disciplined and temporarily restricted the medical licenses of at least three physicians at the Parchman prison. The CMS medical director was cited for habitual drug use, and the prison's chief psychiatrist was restricted because of a history of patient sexual exploitation and sexual harassment.[9]

d.    Elsewhere, CMS has established a pattern of hiring doctors with troubled backgrounds. According to a 1998 investigation by the St. Louis Post-Dispatch, nine CMS doctors working in Missouri had been disciplined by licensing boards.[10]

e.    In Michigan, where CMS provides care to prisoners statewide, CMS has come under scrutiny for its attempts to save money by limiting prisoners' referrals to outside medical specialists. A federal court found that excessive delays in providing prisoners with referrals contributed to three deaths during an 18-month period. Five other prisoners who died during the same time period also experienced significant delays in treatment.[11]

f.    In 2001, the state of Virginia canceled its contract with CMS after fining CMS $900,000 for a number of violations, including failure to provide timely care to inmates.[12]

---

[7] ACLU Sues Major Medical Provider Over Deficient Care in Mississippi Prison; http://www.aclu.org/prisonersrights/aclu-sues-major-medical-provider-over-deficient-care-mississippi-prison, June 22, 2005.

[8] Id

[9] Id

[10] Id

[11] Id

[12] Dying to Get Out: Some inmates tell horror stories about healthcare at the women's prison in Vandalia. Some didn't live to tell their tales. Geri L. Dreiling. http://www.riverfronttimes.com/2003-10-15/news/dying-to-get-out/. October, 15, 2003.

g.     Since March 2003, three Vandalia inmates -- Crystal Smith, Al'Deana Simmons and Sharon Kroll -- have died while in custody, raising allegations of medical neglect. Additionally, the deaths of Vandalia inmates Cheri Rose, Ellen "Honey" Ross and Lavenia Populus during the four years prior to 2003 have spurred accusations of inadequate healthcare.[13]

h.     In July 2003, a CMS nurse gave approximately fifteen Vandalia inmates the wrong antidepressant; as a result, about a dozen prisoners were sent to the hospital.[14]

i.     Two other cases have resulted in medical malpractice lawsuits against CMS and the Missouri Department of Corrections. One was filed in 2001 by the family of Stephanie Summers. The other was filed by recently paroled Vandalia inmate Vicki McElroy, who claims that a hepatitis C treatment plan she was given while in prison in another state was ignored when she was transferred to Missouri. [15]

j.     Another Vandalia inmate, Vera Jones, claimed CMS failed to monitor her for side effects from a tuberculosis medication. Jones, who also suffered from hepatitis C, was medically paroled the summer of 2003 and died soon after.[16]

k.     Teenagers who were being held at the adult Polk County Jail took the stand in a federal class-action lawsuit that asserts they were given inhumane treatment, including prolonged isolation and being pepper-sprayed while held in cages. Southern Poverty Law Center against the Polk County Sheriff's Office and Corizon, the company that provides the jail's medical services. The lawsuit also alleges the jail didn't provide adequate mental health services for the juveniles held in the adult jail.  An attorney for Corizon, the health services contractor, presented documentation that showed several instances of the staff responding to requests for follow-up treatment for a teen who was held in isolation, the Ledger reports[17]

<u>Florida Class Action Involving the Defendant CORIZON</u>

66.  In a Florida Class Action, the Defendant CORIZON, was alleged to have a policy, practice, and custom of not providing needed surgeries to incarcerated people who suffer from painful hernias, except in emergency circumstances.  CORIZON was alleged to have a policy of refusing to provide hernia surgeries, except in emergency circumstances, for the purpose of reducing costs and increasing profits. Thus, leaving dozens, if not hundreds of inmates in

---

[13] *Id*
[14] *Id*
[15] *Id*
[16] *Id*
[17] Lakeland Ledger reports November 26, 2013

severe pain, unable to participate in normal activities, and at risk for serious complications. COPELAND, Et. Al., v.  JULIE L. JONES ("FDC") and CORIZION (Case 4:15-cv-00452-RH-CAS filed September 16, 2015) **See Exhibit E Article Concerning Corizon**

Other Jurisdiction reveal CORIZON widespread failures to treat inmates

67.  A 2014 report detailing failures of medical care by Corizon in Alabama prisons Attributed multiple deaths and serious injuries to "extraordinary understaffing," which caused crises including the failure to monitor diabetic patients and slow or nonexistent emergency responses.

68.  The Alabama report echoes one from Arizona issued in October 2013, which likewise details cases of Corizon' s neglect and mistreatment of inmates. In surveys, Corizon nurses in Arizona confirmed the blistering contents of the report, relating that patients were deprived of urgent medical care because facilities were understaffed and the limited medical personnel who were available were inadequately trained.

69.  In September 2013, Louisiana canceled its contract with Corizon, and six Corizon employees subsequently resigned considering seven health-care related deaths that occurred in the state's prisons over as many months in 2012. At least three of the deaths were preventable.

70.  Corizon and CMS's pattern of delayed or denied medical care killed at least nine Additional people and caused serious or critical injuries to 21 others in Minnesota before the state cancelled its contract with Corizon in 2013. A 2014 audit of Corizon's performance in Minnesota found that the deaths and injuries were in large part attributable to inadequate staffing. In order to cut costs, on weekdays after 4:00p.m. and on weekends, Corizon paid a single doctor to be on call for the entire state prison system.

19

71.  Lawsuits throughout the country, in Alabama, Arizona, California, Florida, Idaho, Indiana, Iowa, Louisiana, Maine, Minnesota, Missouri, New Mexico, and New York, among other states, detail what one D.C. municipal lawmaker identified in 2015 as Corizon's "deeply troubling track record of human rights abuses."

72.  At the time of WILLIAM TEETS incarceration at PCJ, Corizon knew that its deliberate strategy of cutting costs to maximize profits placed those in its care at serious risk of grave illness and even death by among other things, understaffing facilities, inadequately screening and training employees, and denying patients access to needed care. The Defendant Sheriff Grady Judd likewise knew or should have known of Corizon's deadly practices, but instead he disregarded the wellbeing of the individuals in his custody, with severe consequences for as set out herein for WILLIAM TEETS among so many others.

73.  At all times material to this complaint, defendant Corizon was deliberately indifferent to its failure to provide adequate medical care for inmates held in PCJ custody.

## COUNT I

## 42 U.S.C. § 1983 – DEFENDANT SHERIFF GRADY JUDD –OFFICIAL CAPACITY

74.  The Plaintiff incorporates by reference all allegations contained in the preceding paragraphs 1-73 of this Complaint, as if fully set forth herein.

75.  At all times relevant herein, Defendant, SHERIFF GRADY JUDD, was a state actor. All the actions and admissions of Defendant, SHERIFF GRADY JUDD, as alleged herein, were under color of state law. As the Plaintiff was in the custody and control of the Defendant and he cut off the Plaintiff's ability to care for his own well-being, the Defendant, SHERIFF GRADY

JUDD, was under a constitutional duty to provide the Plaintiff with the  basic necessities of life which include, but are not limited to food, shelter and medical care.

76. Defendant, SHERIFF GRADY JUDD's, acts and omissions as alleged more specifically herein breached his constitutional duty and violated the Plaintiff's clearly established rights under the Eight and Fourteenth Amendments to the United States Constitution and amounted to the denial of life, liberty or property without due process of law as the Defendant was deliberately, consciously and intentionally indifferent to the Plaintiff's known serious medical needs for more than 4.5 years by delaying necessary treatment. As a direct and proximate cause of the indifference, the Plaintiff has suffered tremendous pain and suffering, including the permanent loss of his ability to walk, pertinent knee and toe injury and pertinent dental damage to his teeth.

77. Defendant, SHERIFF GRADY JUDD, his agents and employees, knew that Plaintiff was within a zone of risk related to his contact with its agents/employees.

78.     These Defendants owed duties of care to Plaintiff due to Plaintiff being sufficiently restrained of his liberty and freedom to leave and based on Plaintiff's prior and then additional/exacerbated medical conditions in combination with his being in the custody of these Defendants.

79.  Plaintiff was restrained of his liberty, and because he was forced to rely on the services provided by these Defendants, including determinations as to entitlement to medical services, followed by the provision or failure of provision of such medical services, he was in a foreseeable zone of risk, and a duty of care arose. Alternatively, because of the nature of the restraint and the custodial relationship between Plaintiff and these Defendants and based on

Plaintiff's prior and additional/exacerbated medical conditions, they had special relationships with him and, consequently, duties of care were attendant thereto.

80.   Despite the Plaintiff's necessity to have his knee timely examined and treated Defendant Sheriff Judd ignored these needs for referral to an orthopedic surgeon and multiple complaints by the Plaintiff, he was not actually seen by an orthopedic surgeon during his entire 4.5 years after suffering a severe trauma to his left knee, which the Plaintiff complained numerous times about his many attempts to have the Defendant Sheriff Judd hold CORIZON to its contractual obligation to examine, and treat the Plaintiff's serious permanent deteriorating knee condition but to no avail. Despite the Defendant's prior knowledge of the Plaintiff's need for medical attention and treatment, the Defendant willfully and intentionally disregarded this information  in order to discriminate against the Plaintiff and deprive the Plaintiff of his substantive and procedural rights without due process of law.

81.   Defendant, SHERIFF GRADY JUDD, his agents and employees, with knowledge of Plaintiff's serious and obvious medical needs and with deliberate indifference to such medical needs, have acted or failed to act in such a way as to deprive the Plaintiff of necessary and adequate medical care, thereby endangering the Plaintiff's health and well-being. Such acts and omissions of the Defendant, his agents and employees, violated the rights secured to the Plaintiff by the Eight and Fourteenth Amendments of the United States Constitution.

82. Defendant, SHERIFF GRADY JUDD, his agents and employees, with knowledge of Plaintiff's medical needs had a duty under the Eight and Fourteenth Amendment to the United States Constitution to provide needed medical care to inmates of the Polk Central County Jail in conformity with the standard for delivery of such medical care in the State of Florida as a whole.

83. Defendant SHERIFF GRADY JUDD, knowing of the medical needs of the Plaintiff

and knowing also of the inadequacies and deficiencies in the medical facility's staffing and procedures at the Polk County Jail, had a duty to establish and implement policies, practices, and procedures designed to ensure that the Plaintiff received medical care and treatment in conformity with the standards of delivery of such medical care and treatment in the State of Florida as a whole. Specifically, Defendant failed to ensure Plaintiff received urgent medical care only attainable outside the Polk County Jail.

84. Defendant, SHERIFF GRADY JUDD, knowing of the medical needs of the Plaintiff, had a duty to instruct, supervise and train his employees and agents to ensure the delivery of medical care to Plaintiff is consistent with the standards of medical care in the State of Florida. Defendant SHERIFF GRADY JUDD has failed to establish and implement proper training, supervision and monitoring programs designed to ensure that the Plaintiff received proper medical care and treatment.

85. Defendant, SHERIFF GRADY JUDD, had a duty to monitor performance under the contract with CORIZON and a duty to contract with competent medical care providers. Defendant, SHERIFF GRADY JUDD, knew or should have known that Defendant, CORIZON was not fit to serve as the medical service provided at the Polk County Jail.

86. Defendant, SHERIFF GRADY JUDD, knew that Defendant, CORIZON, had a pattern and practice of refusing to send inmates to receive outside specialty treatment to not incur the extra cost of such treatment.

87. As a direct and proximate result of the execution of Defendant, SHERIFF GRADY JUDD's, policies, customs, practices, rules, regulations, ordinances, statutes, and/or usages of the State of Florida, the Plaintiff suffered serious and permanent injuries.

88. By virtue of the facts alleged herein, all committed under the color and pretense of

state law, Defendant, SHERIFF GRADY JUDD, was deliberately indifferent to the Plaintiff's serious medical needs and intentionally discriminated against the Plaintiff and deprived Plaintiff of his civil rights in violation of 42 U.S.C. § 1983, all of which helped create the damages alleged in the Complaint.

## COUNT II

### 42 U.S.C. § 1983 – CORIZON

89.   The Plaintiff incorporates by reference all allegations contained in the preceding paragraphs 1-73 of this Complaint, as if fully set forth herein.

90.   At all times relevant herein, Defendant, CORIZON was the contracted healthcare Provider for the Polk County Jail. All the actions and admissions of Defendant, CORIZON, as alleged herein, were under color of state law as an agent of Sheriff Grady Judd and the Polk County Jail.  The Plaintiff was in the custody and control of the Defendant, SHERIFF JUDD, as such the Plaintiff's ability to care for his own well-being, was cut off.  The Defendant, CORIZON, who was the contracted medical provider for the jail was under a constitutional duty to provide the Plaintiff with the necessities of life which include, but are not limited to food, shelter and medical care.

91.   Defendant, CORIZON, independently and or through its own acts and or omissions and or its employees' acts and omissions as alleged more specifically herein, breached their constitutional duty and violated the Plaintiff's clearly established rights under 42 U.S.C. § 1983 and the Eight and Fourteenth Amendments to the United States Constitution and amounted to the denial of life, liberty or property without due process of law, as the Defendant CORIZON itself and or its employees were deliberately, consciously and intentionally indifferent to the Plaintiff's known serious medical needs.

92.   The Defendant, CORIZON itself and or through its employees, was consciously, deliberately and intentionally indifferent to the medical needs of the Plaintiff for 4.5 years by delaying necessary treatment. As a direct and proximate cause of the indifference, the Plaintiff has suffered tremendous pain and suffering.

93.   Defendant, CORIZON, itself and or through its employees knew that Plaintiff needed medical attention because Plaintiff, WILLIAM TEETS, was seen by employees who were provided by CORIZON, at the Polk County Jail during the Plaintiff's 4.5 years from o June 26, 2012 through on or about January 17, 2017.  Despite serious medical injuries and needs for treatment and medical attention the Defendant CORIZON itself and or through its employees failure to attend to the Plaintiff's serious injuries and medical problems which the same were so obvious, that even a lay person would recognize CORIZON itself and or through its employees took no care or at best a cursory amount in deliberate indifference to the Plaintiff, WILLIAM TEETS critical needs to timely be treated, to see an orthopedic doctor , podiatrist, dentist or other necessary health care provider.

94.   Defendant, CORIZON did not have a proper, effective and medically sufficient referral process. The result is when an inmate such as Plaintiff needed outside medical services there was none offered and or available.  CORIZON knew that inherent delay in treating the Plaintiff would lead to greater injury and adverse consequences for WILLIAM TEETS and other inmates and which resulted in serious permanent injuries to the Plaintiff.

95.   Defendant, CORIZON, had a pattern and practice of refusing to send inmates to receive outside specialty treatment in an effort to not incur the extra cost of such treatment.

96.   The Plaintiff's had a necessity to have immediate physician's referral to an Orthopedic doctor, podiatrist, dentist.  Despite bona fide multiple complaints by the Plaintiff, he

was never offered an opportunity to see any Orthopedic doctor, podiatrist, or dentist until he was released some 4.5 years after incurring his injuries. During which time period the Plaintiff complained numerous times about his deteriorating health conditions throughout his years in confinement to no avail. Despite the Defendant CORIZON's knowledge and or its employees' prior knowledge of the Plaintiff's need for medical attention and treatment, the Defendant, CORIZON itself and or through its employees, willfully and intentionally disregarded this information in order to discriminate against the Plaintiff and deprive the Plaintiff of his substantive and procedural rights without due process of law.

97. Defendant, CORIZON itself and or by and through its employees, who had knowledge of Plaintiff's serious and obvious medical needs and with deliberate indifference to such medical needs, have acted or failed to act in such a way as to deprive the Plaintiff of necessary and adequate medical care, thereby endangering the Plaintiff's health and well-being. Such acts and omissions of the Defendant, CORIZON itself and or by and through its employees, violated the rights secured to the Plaintiff by the Eight and Fourteenth Amendments of the United States Constitution.

98. Defendant, CORIZON by and through its employees, with knowledge of Plaintiff's medical needs have a duty under the Eight and Fourteenth Amendments to the United States Constitution to provide needed medical care to inmates of the Polk County Jail in conformity with the standard for delivery of such medical care in the State of Florida as a whole. Specifically, Defendant failed to ensure Plaintiff received urgent medical care only attainable outside the Polk County Jail.

99. Defendant, CORIZON had a duty to instruct, supervise and train its employees and agents to ensure the delivery of medical care to Plaintiff which is consistent with the standards of

26

medical care in the State of Florida. Defendant, CORIZON has failed to establish and implement proper training, supervision and monitoring programs designed to ensure that the Plaintiff received proper medical care and treatment.

100.     As a direct and proximate result of the execution of Defendant, CORIZON, policies,

customs and practices, the Plaintiff suffered serious and permanent injuries.

101.     By virtue of the facts alleged herein, all committed under the color and pretense of

state law as an agent of Sheriff Grady Judd, Defendant, CORIZON through its employees, was deliberately indifferent to the Plaintiff's serious medical needs and intentionally discriminated against the Plaintiff and deprived Plaintiff of his civil rights in violation of 42 U.S.C. § 1983, all of which helped create the damages alleged in this Complaint.

## COUNT III

### CORIZON - NEGLIGENCE

102.     The Plaintiff incorporates by reference all allegations contained in the preceding

paragraphs 1-73 of this Complaint, as if fully set forth herein.

103.     At all times material hereto, Defendant, CORIZON had a duty to develop,

implement, and monitor compliance with appropriate policies and procedures designed to make sure inmates are seen by the appropriate medical specialist when recommended by staff at CORIZON.

104.     Defendant, CORIZON, breached its duty of care by:

    a.  Failing to develop appropriate policies and procedures for addressing the needs of patients who are to be seen by outside medical specialists;

    b. **Failing to** assure that its employees properly followed-up with patients to confirm he or she received the appropriate outside specialist care as would reasonably be recommended by a doctor; and

    c. Failing to development and implement appropriate safeguards to ensure the safety of Plaintiff, WILLIAM TEETS, who was in Defendant, CORIZON's, care with an obvious need for medical attention with regards to his knee, feet and teeth.

105.    As a direct and proximate result of the foregoing, Plaintiff, WILLIAM

TEETS,

suffered permanent bodily injury and resulting pain and suffering, disability, disfigurement, and

loss of the capacity for the enjoyment of life; reduced ability to perform household tasks and

activities of daily living; and loss of the ability to earn money.

106.    The losses are either permanent or continuing in nature and Plaintiff will suffer

those losses into the future.

## **COUNT IV**

**VIOLATION OF CONSTITUTIONAL RIGHT TO ACCESS TO COURTS-
FOURTEENTH AMENDMENT against Defendant SHERIFF**

107.    The Plaintiff incorporates by reference all allegations contained in the preceding

paragraphs 1-73 of this Complaint, as if fully set forth herein.

106.  This count sets forth claims against Defendant SHERIFF under the Fourteenth

Amendment to the United States Constitution, brought through 42 U.S.C. §1983, in that this

Defendants' systematic refusal to allow access to a library containing basic legal materials, and

otherwise, violated Plaintiff's right to court access provided for in the Fourteenth Amendment to

the United States Constitution.

107.  At all pertinent times, this Defendant had duties to provide access to state and federal courts to detainees confined to the SCJ, including to provide access to a library containing legal materials.

108.  Based on this Defendant's violations of his right to access the courts, and specifically based on its systematic refusal to allow meaningful access to a library containing legal materials, Plaintiff was not able to timely access the courts in connection with the denial of medical services to him while detained, and therefore was not able to timely rectify that situation and to obtain, through court intervention, access to medical care while incarcerated. This Defendant misused its power, possessed by virtue of state law and made possible only because it was clothed with the authority of state law. The violations of Plaintiff's rights, as described above, occurred under color of state law and are actionable under 42 U.S.C. 1983.

109.   The foregoing actions of this Defendant were willful, wanton and in reckless disregard of Plaintiff's rights.

110.  The actions by and on behalf of this Defendant set forth in this count were not unique events of the violations set forth herein. On information and belief, further similar events of wrongful actions on the part of and/or on behalf of this Defendant have taken place, such events combining to determine a pattern of similar wrongful and illegal behavior.

111.  As a direct and proximate result of this Defendant's actions, Plaintiff has been damaged, which damages include: grave mental anguish, pain and suffering, loss of capacity for the enjoyment of life, embarrassment, humiliation, bodily injury, loss of reputation, and the loss of other emoluments.

## COUNT V

**VIOLATION OF CONSTITUTIONAL RIGHT TO ACCESS TO COURTS-FOURTEENTH AMENDMENT against Defendants HENRY and WAGNER**

112.   The Plaintiff incorporates by reference all allegations contained in the preceding paragraphs 1-73 of this Complaint, as if fully set forth herein.

113.   This count sets forth claims against Defendants HENRY and WAGNER under the Fourteenth Amendment to the United States Constitution, brought through 42 U.S.C. §1983, in that these Defendants' systematic refusal to allow access to a library containing basic legal materials, and otherwise, violated Plaintiff's right to court access provided for in the Fourteenth Amendment to the United States Constitution.

114.   At all pertinent times, these Defendants had duties to provide access to state and federal courts to detainees confined to the SCJ, including to provide access to a library containing legal materials.

115.   Based on these Defendants' violations of his right to access the courts, and specifically based on their systematic refusal to allow meaningful access to a library containing legal materials, Plaintiff was not able to timely access the courts in connection with the denial of medical services to him while detained, and therefore was not able to timely rectify that situation and to obtain, through court intervention, access to medical care while incarcerated.

116.   These Defendants misused their power, possessed by virtue of state law and made possible only because they were clothed with the authority of state law. The violations of Plaintiff's rights, as described above, occurred under color of state law and are actionable under 42 U.S.C. 1983.

117.   The foregoing actions of these Defendants were willful, wanton and in reckless disregard of Plaintiff's rights.

118.    The actions by and on behalf of these Defendants set forth in this count were not unique events of the violations set forth herein. On information and belief, further similar events of wrongful actions on the part of and/or on behalf of these Defendants have taken place, such events combining to determine a pattern of similar wrongful and illegal behavior.

119.    As a direct and proximate result of these Defendants' actions, Plaintiff has been damaged, which damages include grave mental anguish, pain and suffering, loss of capacity for the enjoyment of life, embarrassment, humiliation, bodily injury, loss of reputation, and the loss of other emoluments.

## COUNT VI

### BREACH OF CONTRACT AGAINST CORIZON

120.   The Plaintiff incorporates by reference all allegations contained in the preceding paragraphs 1-73 of this Complaint, as if fully set forth herein.

121.   This is a cause for breach of contract for CORIZON's failure to provide necessary medical services to WILLIAM TEETS who was a third-party beneficiary as a inmate.

122.   CORIZON pursuant to contract agreed to providing medical care and treatment, including hospitalization specifically for and on behalf of inmates suffering injuries while in custody as inmates such as WILLIAM TEETS.

123.   In consideration for such services the Polk County Taxpayers paid millions of dollars, per year, specially ear marked for medical services which WILLIAM TEETS needed and to his detriment relied upon.

124.   CORIZON breached the contractual provisions by failing to provide

necessary medical care to WILLIAM TEETS, and said failure resulted in extreme pain

suffering and continues.

125.  CORIZON breached the contractual agreement to provide WILLIAM TEETS

necessary medical care and was the proximate cause which led to WILLIAM TEETS suffering

and permanent injury.

## COUNT VII

## UNJUST ENRICHMENT AGAINST CORIZON

126.  The Plaintiff incorporates by reference all allegations contained in the preceding

paragraphs 1-73 of this Complaint, as if fully set forth herein.

127.  Defendant CORIZON has received millions of Polk County Tax-Payers dollars, per

year, while at the same time failing to provide inmates of PCJ with needed medical care and

professional services with respect to the PCJ population, including WILLIAM TEETS, all to his

detriment and CORIZON as a direct and proximate result has been unjustly enriched.

## COUNT VIII

## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT-FDUTPA

## AGAINST CORIZON[18]

128.  The Plaintiff incorporates by reference all allegations contained in the preceding

paragraphs 1-73 of this Complaint, as if fully set forth herein.

129.  Pursuant to Florida Statute Section 501.204(1), as part of the Florida Deceptive and

Unfair Trade Practices Act (FDUTPA), it is unlawful for any party to engage in unfair or

deceptive acts or practices in the conduct of any trade or commerce.

---

[18] *Florida Polk County v. Prison Health Servs., Inc.*, 170 F.3d 1081 (11th Cir. 1999)

130.  WILLIAM TEETS, as an inmate while at PCJ was a consumer as defined in Florida Statute § 501.203(7).

131.  CORIZON, falsely purports to help inmates and pretrial detainees at PCJ by accepting millions of Polk County Tax-Payer dollars with the deceptive practices of not providing medical service, including those owed to WILLIAM TEETS, "medical service and medical necessary devices are consumer products.

132.  At the inception of the contract, CORIZON intentionally, willfully, and purposefully failed to disclose the fact that it had millions of dollars in litigation and engaged in changing its name to mislead consumers in an effort to fraudulently induce the Defendant Sheriff into entering the subject agreement all to the detriment of inmate consumers, including WILLIAM TEETS.

133.  CORIZON, engaged in continuous and ongoing acts and omissions designed to avoid compliance with its contractual obligations owed to the inmates at PCJ, including, WILLIAM TEETS.

134.  Upon information and belief, CORIZON has engaged in similar unfair and deceptive conduct in its previous dealing with other prison system and their inmate consumers.

## DAMAGES

135.  The Plaintiff incorporates by reference all allegations contained in all paragraphs of this Complaint, as if fully set forth herein.

136.  As a direct and proximate result of the aforementioned actions and omissions of the Defendants, Plaintiff, WILLIAM TEETS's constitutional rights were violated and Plaintiff, WILLIAM TEETS, suffered injuries and damages. Plaintiff, WILLIAM TEETS, seeks recovery from the Defendants of all damages to which he may be entitled under federal law for the

injuries and damages to Plaintiff, WILLIAM TEETS, and which include, but are not limited to, the following:

a.   Physical Pain and Suffering of a past, present and future nature;

b.   Emotional Pain and Suffering of a past, present and future nature;

c.   Medical Expenses of a past, present and future nature;

d.   Permanent Impairment of a past, present and future nature;

e.   Loss of Enjoyment of Life of a past, present and future nature;

f.   Loss of Earning Capacity of a past, present and future nature;

g.   Pre- and Post-Judgment Interest;

h.   Statutory and Discretionary Costs;

i.   Attorney's fees where permitted by 42 USC § 1988 or state law;

j.   A declaratory judgment that the acts and conduct herein was unconstitutional;

k.   Injunctive relief precluding the Defendants from engaging in the conduct complained of herein in the future and requiring the Polk County Sheriff's Office to provide proper policy, training and supervision of its chosen medical provider and holding CORIZON accountable for its misconduct;

l.   All such further relief, both general and specific, to which he may be entitled under the premises.

m.   Attorney fees under Section Fla. Stat. Section 501.204

## **PRAYERS FOR RELIEF**

The Plaintiff incorporates by reference all allegations contained in all paragraphs of this Complaint, as if fully set forth herein.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff WILLIAM TEETS sues

the Defendants for his injuries and damage and prays for a judgment against the Defendants for *compensatory damages* in an amount to be determined by a jury as reasonable and for all such further relief, both general and specific, to which he may be entitled under the premises. While Plaintiff, WILLIAM TEETS, objects to placing a specific sum of money on the value of his injuries and damages, to the extent that a specific demand for a sum of money is required to be requested in the Complaint, the amount should not exceed Two Million ($2,000,000.00) Dollars.

A JURY TRIAL IS RESPECTFULLY DEMANDED TO TRY THE ISSUES.

Respectfully submitted this 13th day of September 2019.

/s/ James R. Tanner
James R. Tanner

| /s/ James R. Tanner | /s/ Marie A. Mattox | /s/ Kennan George Dandar |
|---|---|---|
| James R. Tanner | Marie A. Mattox | Kennan G. Dandar |
| Florida Bar No. 637246 | Florida Bar No. 0739685 | Florida Bar No. 0642363 |
| Tanner Law Group, LLC | Marie A. Mattox, P.A. | Dandar & Dandar, P.A. |
| Post Office Box 260156 | 310 East Bradford Road | 1211 N. Westshore Blvd |
| Tampa, Florida 33685 | Tallahassee, Florida 32303 | Tampa, Florida 33607-4600 |
| Telephone: (813) 322-3565 | Telephone: (850) 383-4800 | Telephone: (813) 289-3858 |
| Email: jrt@jimtannerlaw.com | Email: | Email: kgd@dandarlaw.net |
| Co-counsel for Plaintiff | marie@mattoxlaw.com | Co-counsel for Plaintiff |
| | Co-counsel for Plaintiff | |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served on all counsel of record by CM/ECF this 13th day of September 2019.

/s/ James R. Tanner
James R. Tanner

35